**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| SERVICIOS OJEDA, C.A. | § | |
| | § | |
| PLAINTIFF, | § | |
| | § | |
| v. | § | Civil Action No. _____ |
| | § | |
| CHEVRON CORPORATION AND | § | |
| CHEVRON USA, INC., | § | |
| | § | |
| DEFENDANTS. | § | |

# ORIGINAL COMPLAINT

Servicios Ojeda, C.A. ("Plaintiff" or "Servicios Ojeda") complains of Defendants Chevron Corporation ("Chevron Corp.") and Chevron USA Inc. ("Chevron USA") (collectively "Chevron") as follows:

## I.    NATURE OF THE CASE

Chevron Corporation is a behemoth.  It is one of the largest oil and gas companies in the world, with operations throughout the world, including Venezuela.  For decades, heavy and extra-heavy crude oil from Venezuela's Orinoco Belt have been a critical feedstock for Chevron's refineries, in particular its Pascagoula, Mississippi refinery, and its downstream business generally. Chevron derives billions in earnings annually from its sale of fuels and other refined products made possible through crude oil extracted from the Orinoco Belt and other regions of Venezuela.

Servicios Ojeda, C.A. has been a family-owned business since 1979.  It has provided drilling services to various joint ventures between Chevron and Petróleos de Venezuela, S.A. ("PDVSA") in the Orinoco Belt for approximately twenty-one years.

Chevron Corporation and Chevron USA have benefitted from Plaintiff's work.  Despite that fact, Chevron refuses to pay Plaintiff's invoices exceeding 24 million USD. Chevron reviewed

1

and approved each of Plaintiff's invoices at the time of their original issuance, and as recently as April 18, 2023, it re-affirmed their legitimacy and confirmed the amounts owed would be paid, after Chevron entered into another arrangement with Plaintiff to provide additional services to its joint ventures in Venezuela. Despite the fact that Chevron required Plaintiff to participate in a lengthy account reconciliation process to verify the amounts owed, the invoices remain unpaid. In light of Chevron's silence in response to Plaintiff's numerous requests for payment, it appears that Chevron intends to finance its downstream business on the backs of family-owned businesses and services providers who have helped make the feedstock for Chevron's refineries possible.

Since 2015, the United States has issued a series of Executive Orders restricting trade and economic activity between U.S. persons and Venezuela. The U.S. Department of Treasury's Office of Foreign Asset Control ("OFAC") is tasked with enforcing these Executive Orders, but is also authorized to create limited exceptions to people and entities that apply for "licenses" to operate despite the restrictions set forth in the Executive Orders. Chevron Corporation has been able to operate in Venezuela through such a license. But it is important to emphasize that the U.S. Government granted Chevron a *license* to operate in Venezuela, not a letter of marque. Chevron does not enjoy commercial impunity as to its activities in the Bolivarian Republic of Venezuela, and its permitted activity is limited to that which is specified on its license. Having suffered enormous damage as a result of Chevron's actions, Plaintiff brings this lawsuit because Chevron has left Plaintiff with no alternative but to fight in a forum where Chevron may at last be held to account.

## II.    JURISDICTION AND VENUE

1.      This Court has diversity jurisdiction under 28 U.S.C. § 1332 because the controversy is between a foreign company and citizens of the State of Texas and the amount in controversy exceeds $75,000.

2.      Venue is proper in the Southern District of Texas because Defendants reside in the Southern District of Texas, as required by 28 U.S.C. §1391(b)(1).  Venue is also proper because a substantial part of the events or omissions giving rise to the claim occurred in this district. 28 U.S.C. §1391(b)(2).

## III.    THE PARTIES

### A.    Plaintiff

3.      Plaintiff Servicios Ojeda, C.A. is a Compañía Anónima organized under the laws of the Republic of Venezuela.[1]  Plaintiff is a private, family-owned business.

### B.    Defendants

4.      Defendant Chevron Corporation is a corporation organized under the laws of the State of Delaware and has its headquarters in Houston, Texas.  It can be served through its registered agent, Corporation Service Company DBA CSC Lawyers Incorporating Service Company, 211 East 7th Street, Suite 620, Austin, Texas 78701.

5.      Defendant Chevron USA Inc. is a corporation organized under the laws of the State of Pennsylvania and has its principal place of business in Houston, Texas.  Defendant Chevron USA is a wholly owned subsidiary of Chevron Corporation.  It can be served through its registered agent Corporation Service Company, 211 East 7th Street, Suite 620, Austin, Texas 78701.

---

[1] A Compañía Anónima is similar to a corporation in the United States.

3

## IV.    FACTUAL BACKGROUND

**A.    The Chevron-PDVSA Petropiar Joint Venture in Venezuela**

**_1.    Chevron's Work in Venezuela through Joint Ventures with PDVSA._**

6.    Chevron Corporation is one of the world's largest integrated oil and gas companies. Chevron operates throughout the world and across the value chain of the energy industry, producing crude oil and natural gas; manufacturing transportation fuels, lubricants, petrochemicals and additives; and developing technologies for its own business and the energy industry.

7.    Relevant to this dispute, Chevron Corporation has enjoyed significant operations in Venezuela.  Chevron boasts on its website of the "100 years making history" in Venezuela, stating:

> Chevron is one of the leading private oil companies in Venezuela. Our presence in the country began with exploration activities in 1923, and the discovery of Boscan field in 1946.[2]

8.    Chevron's operations in Venezuela have directly impacted Chevron's earnings, according to Chevron's annual reports and SEC disclosures.

9.    As of the time of this filing, Chevron participates in five joint ventures with Petróleos de Venezuela S.A. ("PDVSA").[3]  Those joint ventures are:

| Name | Chevron Stake | PDVSA Stake | Location |
|---|---|---|---|
| **Petroboscán, S.A.,** | 39.2% | 60.8% | Boscan Field, Zulia State, Western Venezuela |

---

[2]    Chevron Website, Venezuela, 100 years making history, _available at_ https://www.chevron.com/worldwide/venezuela (last visited Apr. 11, 2025).

[3]    Under Venezuelan law, all contracts of joint ventures (or "empresas mixtas") between foreign companies and PDVSA must be reviewed and approved by the Venezuelan National Assembly to operate in Venezuela.  That approval must be recorded and published in the Official Gazette of the Bolivarian Republic of Venezuela to have the force of law.

| **Petroindependiente, S.A** | 25.2% | 74.8% | LL-652 Field, Lake Maracaibo |
| **Petroindependencia, S.A.** *(Extra Heavy Crude Oil Project)* | 34% | 66% | Carabobo 3 Project, Carabobo Area, Orinoco Belt |
| **Loran** *(Offshore Gas Project)* | 60% | 40% | Loran Field, Block 2 along the maritime border of Venezuela and Trinidad and Tobago |
| **Petropiar, S.A.** *(Extra Heavy Crude Oil Project)* | 30% | 70% | Huyapari Field, Orinoco Belt |

### 2. *The Orinoco Belt*

10.    The Orinoco Belt in Venezuela, known as the Orinoco Heavy Oil Belt or Faja Petrolífera del Orinoco, is a massive petroleum-rich region in eastern Venezuela, stretching along the southern bank of the Orinoco River.  It spans approximately 55,000 square kilometers (21,235 square miles) across the states of Anzoátegui, Monagas, Guárico, and Delta Amacuro. The Orinoco Belt is recognized as one of the world's largest oil reserves, containing an estimated 1.2 to 1.4 trillion barrels of oil in place, with recoverable reserves ranging from 220 to 300 billion barrels, depending on technological and economic factors.



11.     The Orinoco Belt is known for producing extra-heavy, sour crude oil, a type of petroleum that is denser and more viscous than conventional crude oil. Raw extra-heavy crude oil like that present in the Orinoco Belt requires special extraction and upgrading techniques to make it suitable for export and refining. It has a relatively high sulfur content of between 2.5-4%, with the sulfur content of upgraded blends, such as Merey, being around 2.5% to 3.0% after dilution or processing. Thus, the upgrading reduces sulfur slightly but not to the level of sweet crude, which has a sulfur content of typically less than 0.5%. This high sulfur content necessitates advanced refining capabilities, such as desulfurization units, to meet global fuel standards, making extra-heavy and heavy crude oils more costly to process than sweet crudes but still valuable given the formers' abundance.

12.     The API gravity of the Orinoco Belt crude oil also reflects its extra-heavy nature. API gravity[4] in this region of Venezuela is low, meaning that the crude oil extracted in this region is dense. Raw extra-heavy crude oil like that produced in the Orinoco Belt has an API gravity number of between 7°-9°. After processing (e.g., dilution with naphtha or lighter hydrocarbons), the API gravity of upgraded synthetic crude increases to 16° to 20° API for blends like Merey, though still classified as heavy crude, which is below 22° API. High sulfur content and API gravity are well-known in the industry to be characteristic of Venezuelan crude oil, especially compared to "light sweet crude," which can be more cheaply and efficiently processed into gasoline, diesel, or kerosene.

13.     While the combination of low API gravity and high-sulfur content of raw extra-heavy crude oil from the Orinoco Belt make it more costly to refine, it is an abundant resource in

---

[4] API gravity is a measure of oil density relative to water (where 10° API equals water's density).

Venezuela, and international oil companies like Chevron operating in Venezuela have adapted their operations accordingly.

**B.    Chevron's Imports Heavy and Extra Heavy Crude Oil Produced in Venezuela to the United States.**

> ### *1.    The Chevron Pascagoula Refinery*

14.    Chevron USA Inc. owns and operates five refineries in the United States: Richmond and El Segundo, California; Pasadena, Texas; Pascagoula, Mississippi; and Salt Lake City, Utah. Chevron USA's Pascagoula Refinery is critical to Chevron Corporation's integrated operations and its reported downstream earnings.

15.    Chevron broke ground at its Pascagoula, Mississippi refinery in November 1961. The refinery began operating in October 1963, after an investment of over $100 million by Chevron.  At the time, the refinery was able to process 100,000 barrels of sweeter crude oil per day, making it the biggest refinery in the industry.[5]

16.    Since that time, Chevron has invested more than $4.5 billion in the Pascagoula facility to expand its refining capacity and expand the type of crude oil that it can process.  Of note, in 1980, Chevron began one of the largest projects in the company's history at the time when it invested $1.3 billion in the Pascagoula Residuum Conversion Project.  Chevron undertook the project in response to a shift in the global oil market in which heavier, high-sulfur crude oils were becoming more attractive due to their availability and lower cost.  The goal of the project was to increase flexibility and profitability by enabling the Pascagoula Refinery to process a broad range of feedstocks, including heavy, sour crudes, while maintaining the quality of the output of products demanded by Chevron's downstream customers.  The Residuum Conversion Project required

---

[5]  Chevron Website, see where we've been and where we're going, *available at* https://pascagoula.chevron.com/who-we-are/history (last visited Apr. 9, 2025).

significant technological upgrades so that Chevron could handle the high-sulfur content and low API gravity of these crudes.

17.     Because of the expansion and upgrades to Chevron Pascagoula Refinery, Chevron was able to process heavy and extra-heavy crude oil like that extracted from Venezuela's Orinoco Belt.  In fact, according to Chevron, "[m]ost of the crude oil processed at the Chevron Pascagoula Refinery comes from foreign sources and arrives by marine tanker."[6]  Upon information and belief, most of the Venezuelan crude oil that Chevron exports to the United States from Venezuela is shipped to Chevron's Pascagoula Refinery.

18.     The Pascagoula Refinery can process approximately 369,000 barrels per day of crude oil, an amount equivalent to a tank with the size of a football field covered to a depth of 41 feet.[7]  The Chevron Pascagoula Refinery is Chevron's largest U.S. refinery and one of the largest petroleum refineries in the United States.[8]

19.     Chevron's Pascagoula Refinery "is primarily a fuels refinery, in that [Chevron] mainly manufacture[s] motor gasoline. Our other products include fuel oils such as Liquefied Petroleum Gas (LPG), aviation gasoline, petroleum coke and sulfur.  The refinery's specialty products include benzene and ethylbenzene, used in the manufacturing of a wide range of products, including automobile tires, sporting goods, nylon, and pharmaceuticals; propylene, used in the

---

[6] Chevron Website, marine tankers, pipelines, *available at* https://pascagoula.chevron.com/what-we-do/crude-oil-transportation-and-storage (last visited Apr. 9, 2025).
[7] Chevron Website, refining crude oil, *available at* https://pascagoula.chevron.com/what-we-do/refining-crude-oil (last visited Apr. 9, 2025).
[8] Chevron Website, about us, *available at* https://pascagoula.chevron.com/who-we-are (last visited Apr. 9, 2025).

manufacture of plastics; and premium base oils, used in high performance lubricants, including motor oils for consumer and commercial use."[9]

> **2. Chevron Ships Venezuelan Heavy and Extra Heavy Crude Oil to Other Gulf Coast Refineries.**

20.    According to records of the U.S. Energy Information Administration ("EIA"), from 2016 to April 2019[10], Chevron USA shipped the following amounts of crude oil from Venezuela to the United States:[11]

| Year | Amount in Barrels | Average Sulfur Content | Average API Gravity |
|---|---|---|---|
| **2016** | 33,837,000 | 3.16 | 17.63 |
| **2017** | 32,523,000 | 2.46 | 18.63 |
| **2018** | 27,162,000 | 3.32 | 15.87 |
| **Jan.-Apr. 2019** | 10,428,000 | 3.48 | 15.40 |
| **TOTAL** | **103,950,000** | | |

21.    Upon information and belief, the crude oil shipped by Chevron USA to the United States from Venezuela included crude oil extracted from Venezuela's Orinoco Belt through Plaintiff's services to Chevron and its joint ventures, as explained below.

---

[9] Chevron Website, refining crude oil, *available at* https://pascagoula.chevron.com/what-we-do/refining-crude-oil (last visited Apr. 9, 2025).

[10] The end date of April 2019 reflected in the chart correlates with the imposition of additional U.S. sanctions.

[11] As described above, Chevron's integrated operations include facilities such as its Pascagoula Refinery that are logical destinations to process Venezuelan crude exploited by Chevron's international joint ventures. Upon information and belief, a significant amount of this crude oil was shipped by Chevron USA to its refinery in Pascagoula, Mississippi. It may have also been shipped to other refiners in the United States, as a result of Chevron selling it to market.

22.     Chevron USA converted this crude oil into fuels and other refined products, which Chevron USA sold in the United States and throughout the globe. During this same time period, Chevron disclosed billions in downstream earnings:

|  | **2016** | **2017** | **2018** | **2019** |
|---|---|---|---|---|
| **United States** | $1,307,000,000 | $2,938,000,000 | $2,103,000,000 | $1,559,000,000 |
| **International** | $2,128,000,000 | $2,276,000,000 | $1,695,000,000 | $922,000,000 |
| **TOTAL** | **$3,435,000,000** | **$5,214,000,000** | **$3,798,000,000** | **$2,481,000,000** |

## C.     Plaintiff's Work in Venezuela for the Chevron-PDVSA Petropiar Project.

### *1.   The Petropiar Project*

23.     The Chevron-PDVSA Petropiar project is a vertically integrated project in the Orinoco Belt, in which extra-heavy crude oil from the Huyapari Field is processed and upgraded to a lighter, high-value synthetic oil.

24.     Petropiar was originally formed in 2007, emerging from the earlier Ameriven JV, which was established in 1997 during the "Apertura Petrolera." Ameriven initially comprised PDVSA with a 30% stake, ChevronTexaco (30%), and ConocoPhillips (40%) and was focused on extracting and upgrading extra-heavy crude and converting it into synthetic oil. Operations began in 2001, with a 190,000 barrel-per-day upgrader completed in 2004.

25.     In 2006–2007, Ameriven was restructured, following a change in the law that mandated that PDVSA maintain a minimum 60% stake in all Orinoco Belt JVs. ConocoPhillips exited Ameriven and Venezuela in 2007. Chevron remained and accepted a reduced 30% stake in the joint venture. PDVSA's stake rose to 70%, and the venture was rebranded Petropiar, which inherited Ameriven's infrastructure to produce blends like Merey.[12]

---

[12] Despite a diligent search, the joint venture agreements between Chevron Corporation and PDVSA are not available publicly. Thus, Plaintiff refers to Chevron Corporation as the 30%

26.     Plaintiff has provided drilling and well services to Petropiar in the Huyapari Field since Petropiar's formation in 2007.    In fact, Plaintiff provided services to its predecessor, Ameriven, from 2004 until the formation of Petropiar.

27.     At all times from 2016 to 2020, Plaintiff provided drilling and well services to the Petropiar project, consistent with the services it had provided to the project since 2007 and, before that, to Ameriven.

28.     Plaintiff provided services during this time period under the following contracts: Contract Number 4600097345-4600097346, Contract Number 4600087362-4600087363, Contract Number 4600097430-4600097432, Contract Number 4600076917-4600076920, and Contract Number 4600098135-4600098136.

29.     Plaintiff issued invoices for its services, consistent with the terms of the contracts and consistent with its regular practices in working with the joint venture.    To summarize the process, once Plaintiff provided the services for a particular job, a Petropiar employee—*i.e.*, a representative relocated from PDVSA to Petropiar—signed the field report.    If a Petropiar employee was unavailable, a Chevron employee would sign the field report.    From there, the field report went to the Petropiar office where Chevron and Petropiar employees prepared the valuation report.    Based on the valuation report, Petropiar prepared the service entry sheet through the SAP system. The service entry sheet was converted to an invoice by Plaintiff, and the invoice reflected the service entry sheet number. Without the service entry sheet, no invoice could be issued.

30.     For each invoice issued, including the unpaid invoices at the heart of this dispute, one or more Chevron representatives had the opportunity to review, alter, and/or approve the

member of the joint venture, consistent with Chevron's public statements on the subject. *See, e.g.,* Chevron Website, Venezuela, *available at* https://www.chevron.com/worldwide/venezuela (last visited Apr. 11, 2025).

amounts that Plaintiff invoiced. For certain invoices, the underlying field report was actually signed by a Chevron representative at the well. These Chevron representatives were identifiable in both the drill site and back-office settings, as it was known that they were Chevron representatives or employees "assigned" to the Petropiar project, and they used Chevron e-mail addresses to conduct business.

31.     Normally, invoices were paid within 60 to 90 days. Despite these facts, Plaintiff's invoices from the 2016-2020 time period remain unpaid. Plaintiff has made numerous inquiries and requests for payment to representatives of Petropiar and Chevron.

### 2.   U.S. Sanctions Against Venezuela

32.     In 2019, after increasing sanctions pressure over a number of years, the United States sanctioned Venezuela's oil and explicitly included PDVSA. The impact was immediate: companies like Chevron and U.S. refineries, once reliant on Venezuelan oil, were cut off. PDVSA's non-U.S. partners could still produce oil but were barred from exporting that oil to the U.S. market.

33.     On August 5, 2019, under EO 13884, the United States blocked all property and interests of the Venezuelan government, including PDVSA, in the U.S. or under U.S. control. This move prohibited nearly all dealings with PDVSA unless explicitly authorized. To mitigate some effects, the Treasury issued General License 7, allowing limited transactions with PDVSA subsidiaries like CITGO, and General License 8, which permitted U.S. firms such as Chevron to maintain essential operations in Venezuela, although they were strictly forbidden from drilling, processing, or exporting oil.

34.     As a result of the imposition of U.S. sanctions, Plaintiff's work for the Chevron-PDVSA joint venture, Petropiar, drew to a halt in accordance with OFAC General License 8 issued

to Chevron. Nevertheless, before the cessation of the work pursuant to these U.S. Treasury regulations, Plaintiff had performed significant services for Chevron and Petropiar, which invoiced following the cessation of work and which remain unpaid.

35.    By 2022, U.S. policy showed signs of flexibility as the United States explored ways to balance sanctions with incentives for electoral reforms in Venezuela. While no new EOs were issued, on November 26, 2022, the U.S. Treasury issued General License 41, which authorized Chevron to resume limited oil extraction and exports from Venezuela.

36.    At this point, Chevron needed to identify drilling and well services providers who could competently operate in Venezuela and who could satisfy U.S. compliance requirements. Knowing that Plaintiff had previously provided such competent services to Chevron and its joint ventures in the past, a Chevron manager requested that Plaintiff provide its documentation of regulatory compliance. Plaintiff did so, proving its independence and compliance with U.S. regulations and laws, thereby validating itself as a viable counterparty with whom Chevron could continue its profitable exploration of Venezuelan oil reserves.

37.    Once it determined that Plaintiff's operations and affiliations posed no risk to its OFAC license, Chevron began negotiating a new arrangement with Plaintiff. But Plaintiff was still tens of millions of dollars out of pocket for services provided to Chevron and its joint ventures from the 2016 to 2020 time period. Knowing that Plaintiff was hesitant to enter into another arrangement with Chevron after having been left holding the bag for years-old operations, the Chevron manager negotiating the new arrangement told Plaintiff that Plaintiff's older invoices were highly unlikely to be paid if Plaintiff did not agree to perform additional services for Chevron. Likewise, that Chevron manager stated that service companies who were current business partners with Chevron were going to be the first to have past-due invoices paid. Because of this explicit

pressure, Plaintiff's management entered into a new arrangement to perform drilling and well services for Chevron and its joint ventures, as Chevron had indicated that, going forward, it would honor both its new obligations for services requested and its old obligations for past services performed for its Venezuelan operations.

38.    The working relationship between Chevron and Plaintiff continues to the present, with two distinct Chevron joint ventures in Venezuela having recently contracted for Plaintiff's rigs pursuant to the post-General License 41 agreement.

39.    As a result of General License 41, Chevron's exports from Venezuela reached about 240,000 barrels per day, marking a significant boost to Venezuela's output and a departure from the near-total freeze of 2019-2021.[13]    Chevron continues to promote its drilling activity in Venezuela on its website,[14] and, as of the filing of this lawsuit, it continues to be one of the largest stakeholders in the Orinoco Belt, including working in Venezuela via the Petropiar joint venture.[15]

### 3.    The Reconciliation and Approval of Plaintiff's Outstanding Invoices

40.    Not coincidentally, after Chevron and Plaintiff began working together under the new terms negotiated after the issuance of General License 41, Chevron and Petropiar appeared willing to assist in getting Plaintiff's outstanding invoices paid at last. By this point in February

---

[13] On February 26, 2025, the U.S. Government announced that it was revoking General License 41 granted to Chevron.  Under General License 41B issued on March 24, 2025, Chevron has until 12:01 a.m. eastern daylight time on May 27, 2025, to wind down its operations in Venezuela.

On April 10, 2025, Venezuela and PDVSA cancelled several authorizations granted to Chevron to load and export Venezuelan crude oil.

[14] See Chevron Website, Venezuela, *available at* https://www.chevron.com/worldwide/venezuela (last visited Apr. 13, 2025).

[15] *See* VENEZUELA'S PDVSA TO KEEP PRODUCING, EXPORTING OIL PREVIOUSLY HANDLED BY CHEVRON, DOCUMENT SAYS, REUTERS, *available at*
 https://www.reuters.com/business/energy/venezuelas-pdvsa-produce-refine-export-crude-previously-handled-by-chevron-2025-03-17/ (last visited Apr. 13, 2025).

2023, the invoices had remained unpaid for several years—all the while Plaintiff had been consistent in pressing for payment from Chevron's and Petropiar's representatives.

41.    Chevron and Petropiar representatives invited Plaintiff to participate in a reconciliation process to re-submit each pending invoice and its accompanying support to substantiate the pending charges. Because Chevron appeared to be softening from its previous (years-long) stonewall approach, Plaintiff interpreted the request to review Plaintiff's accounts receivables as a confirmation of what Chevron's contracts manager had said: Chevron would be satisfying Petropiar's unpaid invoices from the 2016-2020 period because Plaintiff agreed to perform additional services for Chevron and its joint ventures under the new arrangement.

42.    The reconciliation process requested by Chevron and Petropiar was not set forth in Plaintiff's original agreement with Petropiar. Rather, Chevron and Petropiar imposed new obligations on Plaintiff as conditions for payment, none of which were contractually required. Chevron and Petropiar requested Plaintiff reconcile its books and invoices for the amounts due with the expectation that, if the reconciliation reflected accurate invoicing, then Chevron would pay the invoices.

43.    With that expectation, Plaintiff re-submitted each pending invoice and its support. It already had the invoices and accompanying support readily available in its records, as it had submitted the invoices and support in real-time as the services were provided.

44.    Having received Plaintiff's materials, on February 24, 2023, Chevron and Petropiar representatives advised that they were in the final stage of the reconciliation process, although they needed additional information, which Plaintiff provided soon thereafter.

45.     Plaintiff repeatedly followed up to ascertain the status of the reconciliation process and payment of the pending invoices.  Having heard no response, on April 11, 2023, Plaintiff requested a formal meeting.

46.     On April 17, 2023, a meeting among representatives of Chevron, Petropiar, and Plaintiff took place, where Plaintiff walked the Chevron and Petropiar representatives through these pending invoices.  On April 18, 2023, Chevron confirmed in writing the discussion at the meeting and that the reconciliation process was complete and nothing further from Plaintiff was needed.

47.     This correspondence was one of many sent from Chevron employees and executives, using an @chevron.com email addresses. It was typical for Plaintiff to communicate with Chevron representatives through that channel, even though the subject matter concerned past services provided to Petropiar and payment due from Petropiar.

48.     The reconciliation process confirmed the legitimacy of Plaintiff's outstanding balance.  Despite that Chevron considered the reconciliation process complete as of April 18, 2023, Chevron had unfortunately not changed its tack throughout the years. Its manager's statements that renewed service providers for Chevron would be the first to have old invoices paid appeared to be a false negotiation tactic as, by September 2023, Plaintiff had still not been paid on the outstanding invoices that had been fully reconciled. Plaintiff followed up numerous times again with no satisfactory explanation from Chevron or Petropiar on the non-payment.

49.     As of the filing of this lawsuit, the following invoices remain unpaid:

| ITEM | INVOICE NUMBER | CONTRACT NUMBERS | ORDER | AMOUNT USD | 16% VALUE ADDED TAX USD | TOTAL USD |
|---|---|---|---|---|---|---|
| 1 | 25617 | 4600087362 / 4600087363 | 4200411316 | $173,722.95 | $27,795.67 | $201,518.62 |

| 2 | 25618 | 4600087362 / 4600087363 | 4200411316 | $121,464.16 | $19,434.27 | $140,898.43 |
| 3 | 25681 | 4600098135 / 4600098136 | 4200411332 | $197,761.50 | $31,641.84 | $229,403.34 |
| 4 | 25690 | 4600098135 / 4600098136 | 4200411332 | $274,350.00 | $43,896.00 | $318,246.00 |
| 5 | 25716 | 4600097430 / 4600097432 | 4200411378 | $223,483.94 | $35,757.43 | $259,241.37 |
| 6 | 25717 | 4600097430 / 4600097432 | 4200411378 | $129,608.00 | $20,737.28 | $150,345.28 |
| 7 | 25744 | 4600087362 / 4600087363 | 4200422201 | $29,460.00 | $4,713.60 | $34,173.60 |
| 8 | 25745 | 4600087362 / 4600087363 | 4200422201 | $19,640.00 | $3,142.40 | $22,782.40 |
| 9 | 25748 | 4600087362 / 4600087363 | 4200422201 | $34,370.00 | $5,499.20 | $39,869.20 |
| 10 | 25749 | 4600097430 / 4600097432 | 4200423196 | $174,979.44 | $27,996.71 | $202,976.15 |
| 11 | 25750 | 4600087362 / 4600087363 | 4200424478 | $1,868.68 | $298.99 | $2,167.67 |
| 12 | 25751 | 4600087362 / 4600087363 | 4200424478 | $1,808.40 | $289.34 | $2,097.74 |
| 13 | 25752 | 4600087362 / 4600087363 | 4200424478 | $1,868.68 | $298.99 | $2,167.67 |
| 14 | 25753 | 4600087362 / 4600087363 | 4200424478 | $1,808.40 | $289.34 | $2,097.74 |
| 15 | 25754 | 4600087362 / 4600087363 | 4200424478 | $138,672.48 | $22,187.60 | $160,860.08 |
| 16 | 25755 | 4600087362 / 4600087363 | 4200424478 | $58,464.46 | $9,354.31 | $67,818.77 |

| 17 | 25756 | 4600087362 / 4600087363 | 4200424479 | $110,569.70 | $17,691.15 | $128,260.85 |
| 18 | 25757 | 4600087362 / 4600087363 | 4200424479 | $29,460.00 | $4,713.60 | $34,173.60 |
| 19 | 25758 | 4600087362 / 4600087363 | 4200424479 | $136,375.02 | $21,820.00 | $158,195.02 |
| 20 | 25759 | 4600087362 / 4600087363 | 4200424479 | $2,643.00 | $422.88 | $3,065.88 |
| 21 | 25762 | 4600098135 / 4600098136 | 4200411332 | $274,350.00 | $43,896.00 | $318,246.00 |
| 22 | 25763 | 4600098135 / 4600098136 | 4200411332 | $274,350.00 | $43,896.00 | $318,246.00 |
| 23 | 25766 | 4600098135 / 4600098136 | 4200411332 | $274,350.00 | $43,896.00 | $318,246.00 |
| 24 | 25767 | 4600098135 / 4600098136 | 4200411332 | $274,350.00 | $43,896.00 | $318,246.00 |
| 25 | 25768 | 4600098135 / 4600098136 | 4200411332 | $265,500.00 | $42,480.00 | $307,980.00 |
| 26 | 25770 | 4600098135 / 4600098136 | 4200411925 | $71,744.00 | $11,479.04 | $83,223.04 |
| 27 | 25771 | 4600098135 / 4600098136 | 4200411925 | $180,171.74 | $28,827.48 | $208,999.22 |
| 28 | 25772 | 4600098135 / 4600098136 | 4200411925 | $251,230.29 | $40,196.85 | $291,427.14 |
| 29 | 25773 | 4600098135 / 4600098136 | 4200411925 | $37,984.82 | $6,077.57 | $44,062.39 |
| 30 | 25774 | 4600098135 / 4600098136 | 4200411925 | $375,669.76 | $60,107.16 | $435,776.92 |
| 31 | 25775 | 4600098135 / 4600098136 | 4200411925 | $296,737.97 | $47,478.08 | $344,216.05 |

| 32 | 25776 | 4600098135 / 4600098136 | 4200411925 | $307,037.88 | $49,126.06 | $356,163.94 |
| 33 | 25777 | 4600098135 / 4600098136 | 4200411925 | $292,156.50 | $46,745.04 | $338,901.54 |
| 34 | 25778 | 4600098135 / 4600098136 | 4200411332 | $265,500.00 | $42,480.00 | $307,980.00 |
| 35 | 25782 | 4600098135 / 4600098136 | 4200411332 | $265,500.00 | $42,480.00 | $307,980.00 |
| 36 | 25783 | 4600097430 / 4600097432 | 4200411378 | $129,608.00 | $20,737.28 | $150,345.28 |
| 37 | 25802 | 4600097430 / 4600097432 | 4200424480 | $44,133.58 | $7,061.37 | $51,194.95 |
| 38 | 25806 | 4600097430 / 4600097432 | 4200424481 | $17,354.40 | $2,776.70 | $20,131.10 |
| 39 | 25807 | 4600097430 / 4600097432 | 4200424481 | $41,227.20 | $6,596.35 | $47,823.55 |
| 40 | 25811 | 4600097430 / 4600097432 | 4200424481 | $40,420.80 | $6,467.33 | $46,888.13 |
| 41 | 25818 | 4600097430 / 4600097432 | 4200425567 | $162,600.00 | $26,016.00 | $188,616.00 |
| 42 | 25863 | 4600097345 / 4600097346 | 4200425730 | $200,546.82 | $32,087.49 | $232,634.31 |
| 43 | 25864 | 4600097345 / 4600097346 | 4200426446 | $191,666.51 | $30,666.64 | $222,333.15 |
| 44 | 25865 | 4600097345 / 4600097346 | 4200428115 | $118,107.59 | $18,897.21 | $137,004.80 |
| 45 | 25866 | 4600097345 / 4600097346 | 4200428117 | $122,044.51 | $19,527.12 | $141,571.63 |
| 46 | 25868 | 4600097430 / 4600097432 | 4200424482 | $13,087.19 | $2,093.95 | $15,181.14 |

| 47 | 25869 | 4600097430 / 4600097432 | 4200425951 | $201,993.67 | $32,318.99 | $234,312.66 |
| 48 | 25870 | 4600097430 / 4600097432 | 4200426652 | $89,574.85 | $14,331.98 | $103,906.83 |
| 49 | 25871 | 4600097430 / 4600097432 | 4200490913 | $188,021.71 | $30,083.47 | $218,105.18 |
| 50 | 25872 | 4600097430 / 4600097432 | 4200490913 | $88,020.00 | $14,083.20 | $102,103.20 |
| 51 | 25873 | 4600097430 / 4600097432 | 4200490913 | $171,540.00 | $27,446.40 | $198,986.40 |
| 52 | 25874 | 4600097430 / 4600097432 | 4200490913 | $90,954.00 | $14,552.64 | $105,506.64 |
| 53 | 25875 | 4600097430 / 4600097432 | 4200490913 | $177,208.00 | $28,353.28 | $205,561.28 |
| 54 | 25876 | 4600097430 / 4600097432 | 4200490913 | $16,603.27 | $2,656.52 | $19,259.79 |
| 55 | 25877 | 4600097430 / 4600097432 | 4200490913 | $36,043.55 | $5,766.97 | $41,810.52 |
| 56 | 25878 | ODS-PERF-2018-0035 | 4200426023 | $143,760.22 | $23,001.64 | $166,761.86 |
| 57 | 25879 | ODS-PERF-2018-0035 | 4200426030 | $94,590.49 | $15,134.48 | $109,724.97 |
| 58 | 25880 | ODS-PERF-2018-0035 | 4200426027 | $265,515.22 | $42,482.44 | $307,997.66 |
| 59 | 25881 | ODS-PERF-2018-0035 | 4200426030 | $172,530.39 | $27,604.86 | $200,135.25 |
| 60 | 25882 | ODS-PERF-2018-0035 | 4200426021 | $89,367.00 | $14,298.72 | $103,665.72 |
| 61 | 25883 | ODS-PERF-2018-0035 | 4200426023 | $1,617.00 | $258.72 | $1,875.72 |

| 62 | 25884 | ODS-PERF-2018-0035 | 4200426020 | $268,101.00 | $42,896.16 | $310,997.16 |
| 63 | 25885 | ODS-PERF-2018-0035 | 4200426022 | $268,101.00 | $42,896.16 | $310,997.16 |
| 64 | 25886 | ODS-PERF-2018-0035 | 4200426028 | $45,057.72 | $7,209.24 | $52,266.96 |
| 65 | 25887 | ODS-PERF-2018-0035 | 4200426021 | $178,734.00 | $28,597.44 | $207,331.44 |
| 66 | 25888 | ODS-PERF-2018-0035 | 4200426025 | $284,706.00 | $45,552.96 | $330,258.96 |
| 67 | 25889 | ODS-PERF-2018-0035 | 4200426023 | $43,626.95 | $6,980.31 | $50,607.26 |
| 68 | 25890 | ODS-PERF-2018-0035 | 4200426024 | $93,896.03 | $15,023.36 | $108,919.39 |
| 69 | 25891 | ODS-PERF-2018-0035 | 4200426031 | $268,101.00 | $42,896.16 | $310,997.16 |
| 70 | 25892 | ODS-PERF-2018-0035 | 4200426029 | $236,550.00 | $37,848.00 | $274,398.00 |
| 71 | 25893 | ODS-PERF-2018-0035 | 4200426026 | $284,706.00 | $45,552.96 | $330,258.96 |
| 72 | 25894 | ODS-PERF-2018-0035 | 4200426024 | $207,626.59 | $33,220.25 | $240,846.84 |
| 73 | 25895 | ODS-PERF-2018-0035 | 4200426028 | $191,492.26 | $30,638.76 | $222,131.02 |
| 74 | 25896 | 4600097345 / 4600097346 | 4200430277 | $87,158.39 | $13,945.34 | $101,103.73 |
| 75 | 25897 | ODS-PERF-2019-0001 | 4200490235 | $177,105.90 | $28,336.94 | $205,442.84 |
| 76 | 25898 | ODS-PERF-2019-0001 | 4200490235 | $186,405.12 | $29,824.82 | $216,229.94 |

| 77 | 25899 | ODS-PERF-2019-0001 | 4200490235 | $146,175.03 | $23,388.00 | $169,563.03 |
| 78 | 25900 | ODS-PERF-2019-0001 | 4200490235 | $205,254.76 | $32,840.76 | $238,095.52 |
| 79 | 25901 | ODS-PERF-2019-0001 | 4200490235 | $220,055.01 | $35,208.80 | $255,263.81 |
| 80 | 25902 | ODS-PERF-2019-0001 | 4200490235 | $234,258.00 | $37,481.28 | $271,739.28 |
| 81 | 25903 | ODS-PERF-2019-0001 | 4200490235 | $185,383.54 | $29,661.37 | $215,044.91 |
| 82 | 25904 | ODS-PERF-2019-0001 | 4200490235 | $246,042.03 | $39,366.72 | $285,408.75 |
| 83 | 25905 | ODS-PERF-2019-0001 | 4200490235 | $228,909.21 | $36,625.47 | $265,534.68 |
| 84 | 25906 | ODS-PERF-2019-0001 | 4200490235 | $198,950.14 | $31,832.02 | $230,782.16 |
| 85 | 25907 | ODS-PERF-2019-0001 | 4200490235 | $205,265.77 | $32,842.52 | $238,108.29 |
| 86 | 25908 | ODS-PERF-2019-0001 | 4200490235 | $263,939.95 | $42,230.39 | $306,170.34 |
| 87 | 25909 | ODS-PERF-2019-0001 | 4200490235 | $170,836.54 | $27,333.85 | $198,170.39 |
| 88 | 25910 | ODS-PERF-2019-0001 | 4200490235 | $201,084.25 | $32,173.48 | $233,257.73 |
| 89 | 25912 | ODS-PERF-2019-0001 | 4200490235 | $182,775.96 | $29,244.15 | $212,020.11 |
| 90 | 25913 | ODS-PERF-2019-0001 | 4200490235 | $273,083.71 | $43,693.39 | $316,777.10 |
| 91 | 25914 | ODS-PERF-2019-0001 | 4200490235 | $178,357.60 | $28,537.22 | $206,894.82 |

| 92 | 25916 | ODS-PERF-2019-0001 | 4200490235 | $228,679.61 | $36,588.74 | $265,268.35 |
| 93 | 25917 | ODS-PERF-2019-0001 | 4200490235 | $172,452.56 | $27,592.41 | $200,044.97 |
| 94 | 25919 | ODS-PERF-2019-0001 | 4200490235 | $200,607.50 | $32,097.20 | $232,704.70 |
| 95 | 25920 | ODS-PERF-2019-0001 | 4200490235 | $212,493.50 | $33,998.96 | $246,492.46 |
| 96 | 25921 | ODS-PERF-2019-0001 | 4200490235 | $217,262.50 | $34,762.00 | $252,024.50 |
| 97 | 25922 | ODS-PERF-2019-0001 | 4200490235 | $175,945.06 | $28,151.21 | $204,096.27 |
| 98 | 25924 | ODS-PERF-2019-0001 | 4200490235 | $129,160.65 | $20,665.70 | $149,826.35 |
| 99 | 25925 | ODS-PERF-2019-0001 | 4200490235 | $61,658.31 | $9,865.33 | $71,523.64 |
| 100 | 25926 | ODS-PERF-2019-0002 | 4200490235 | $185,106.86 | $29,617.10 | $214,723.96 |
| 101 | 25927 | ODS-PERF-2019-0002 | 4200431244 | $197,505.48 | $31,600.88 | $229,106.36 |
| 102 | 25928 | ODS-PERF-2019-0002 | 4200421183 | $184,166.05 | $29,466.57 | $213,632.62 |
| 103 | 25929 | ODS-PERF-2019-0002 | 4200431245 | $189,504.35 | $30,320.70 | $219,825.05 |
| 104 | 25930 | ODS-PERF-2019-0002 | 4200431187 | $173,617.38 | $27,778.78 | $201,396.16 |
| 105 | 25931 | ODS-PERF-2019-0002 | 4200431189 | $189,995.94 | $30,399.35 | $220,395.29 |
| 106 | 25932 | ODS-PERF-2019-0002 | 4200431190 | $186,274.97 | $29,804.00 | $216,078.97 |

| 107 | 25933 | ODS-PERF-2019-0002 | 4200431191 | $200,464.25 | $32,074.28 | $232,538.53 |
| 108 | 25934 | ODS-PERF-2019-0002 | 4200431194 | $208,183.13 | $33,309.30 | $241,492.43 |
| 109 | 25935 | ODS-PERF-2019-0002 | 4200431196 | $200,667.21 | $32,106.75 | $232,773.96 |
| 110 | 25936 | ODS-PERF-2019-0002 | 4200431196 | $188,631.19 | $30,180.99 | $218,812.18 |
| 111 | 25937 | ODS-PERF-2019-0002 | 4200431198 | $210,821.61 | $33,731.46 | $244,553.07 |
| 112 | 25938 | ODS-PERF-2019-0002 | 4200431256 | $170,764.28 | $27,322.28 | $198,086.56 |
| 113 | 25939 | ODS-PERF-2019-0002 | 4200431227 | $146,950.17 | $23,512.03 | $170,462.20 |
| 114 | 25940 | ODS-PERF-2019-0002 | 4200431259 | $190,445.16 | $30,471.23 | $220,916.39 |
| 115 | 25941 | ODS-PERF-2019-0002 | 4200431276 | $177,117.38 | $28,338.78 | $205,456.16 |
| 116 | 25942 | ODS-PERF-2019-0002 | 4200431261 | $165,480.95 | $26,476.95 | $191,957.90 |
| 117 | 25945 | ODS-PERF-2019-0002 | 4200431272 | $166,225.14 | $26,596.02 | $192,821.16 |
| 118 | 25946 | ODS-PERF-2019-0002 | 4200431215 | $189,295.05 | $30,287.21 | $219,582.26 |
| 119 | 25947 | ODS-PERF-2019-0002 | 4200431216 | $183,679.80 | $29,388.77 | $213,068.57 |
| 120 | 25949 | ODS-PERF-2019-0002 | 4200431217 | $72,598.76 | $11,615.80 | $84,214.56 |
| 121 | 25950 | ODS-PERF-2019-0002 | 4200431192 | $199,658.75 | $31,945.40 | $231,604.15 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 122 | 25951 | ODS-PERF-2019-0002 | 4200431213 | $189,903.93 | $30,384.63 | $220,288.56 |
| 123 | 25953 | ODS-PERF-2019-0002 | 4200431212 | $140,719.70 | $22,515.15 | $163,234.85 |
| 124 | 25956 | ODS-PERF-2019-0002 | 4200431180 | $197,600.43 | $31,616.07 | $229,216.50 |
| 125 | 25996 | 4600078244 | 4200319218 | $26,000.24 | $4,160.04 | $30,160.28 |
| 126 | 26623 | 4600097432 | 4200521630 | $34,192.36 | $5,470.78 | $39,663.14 |
| 127 | 26618 | 4600098136 | 4200515076 | $90,445.12 | $14,471.22 | $104,916.34 |
| | | 4600098136 | 4200515076 | | | |
| | | 4600098136 | 4200515076 | | | |
| | | 4600098136 | 4200515076 | | | |
| 128 | 26619 | 4600098136 | 4200515076 | $97,173.00 | $15,547.68 | $112,720.68 |
| | | 4600098136 | 4200515076 | | | |
| | | 4600098136 | 4200515076 | | | |
| | | 4600098136 | 4200515076 | | | |
| 129 | 26620 | 4600098136 | 4200515076 | $68,663.80 | $10,986.21 | $79,650.01 |
| | | 4600098136 | 4200515076 | | | |
| | | 4600098136 | 4200515076 | | | |
| | | 4600098136 | 4200515076 | | | |
| 130 | 26621 | 4600098136 | 4200515076 | $88,729.18 | $14,196.67 | $102,925.85 |
| | | 4600098136 | 4200515076 | | | |
| | | 4600098136 | 4200515076 | | | |
| | | 4600098136 | 4200515076 | | | |
| 131 | 26622 | 4600098136 | 4200515076 | $25,385.26 | $4,061.64 | $29,446.90 |
| | | | **TOTAL** | **$20,773,113.77** | **$3,323,698.20** | **$24,096,811.97** |

See Exhibit A, Declaration of Alfonso Mercurio, attached.

50.    At least one Chevron representative was involved in the original approval and invoicing of all 131 of these unpaid bills. And again, some of the field reports underlying these

25

invoices were signed by a Chevron representative on the drill site, a regular occurrence whenever the Petropiar representative was unavailable.

51.    Chevron was likewise aware of the outstanding balance due to Plaintiff when it sought Plaintiff's additional services in 2022, and it was these underlying invoices that Chevron's contract manager was referencing when he indicated that Plaintiff's agreement to perform future drilling and well services would result in a prioritized satisfaction of Plaintiff's outstanding payables. Further, Chevron representatives directly engaged Plaintiff in the reconciliation process and were in receipt of the corresponding information that confirmed the validity of these invoices and Petropiar's failure to pay.

52.    Chevron's failure to pay Plaintiff's invoices has imposed a severe financial burden on Plaintiff and its ownership, interrupting Plaintiff's cash flow, affecting its ongoing operations, and threatening its very existence as a company.

53.    Plaintiff has made numerous formal requests to Chevron and Petropiar representatives for payment.  On October 29, 2024 and March 25, 2025, it sent two formal written letters to a Chevron executive, Martin Phillipsen, who is the General Manager of Petropiar, to intervene. Plaintiff has had several interactions with Phillipsen's team, particularly other Chevron representatives, who have told Plaintiff that they were working to get Plaintiff paid for Petropiar's debts.  Plaintiff's repeated efforts to engage in discussions have been met with only delays and silence.

### 4.    *Petropiar is Insolvent, Having Been Sustained Only By Chevron's Financial Support and Operational Control.*

54.    In the course of trying to be paid in full on the debt that Chevron and Petropiar have conceded Plaintiff is owed, Plaintiff has learned information about Petropiar's financial condition. Upon information and belief, the Chevron Petropiar joint venture owes services providers

26

approximately 840 to 880 million USD.  In other words, the project is nearly one billion dollars in debt.

55.    Moreover, upon information and belief, joint ventures involving foreign companies in Venezuela effectively exist on paper.  They have very few, if any, direct employees.  All officers and employees come from their shareholders, as exemplified by Chevron's installment of its executives and employees at Petropiar and its use of Chevron.com emails for regular business activity.[16]

56.    Relatedly, upon information and belief, Chevron also extensively controls the operations of the Petropiar project, given its technical expertise.  Chevron brings the know-how for handling the Orinoco Belt's extra-heavy crude, which requires advanced extraction and upgrading processes.  Upon information and belief, Chevron also controls all accounts receivable for the joint venture, approves amounts to be paid to Venezuelan service providers such as Plaintiff, and disburses any capital that eventually makes its way to satisfy debts to those service providers.  Further, in November 2022, Chevron installed one of its executives, Martin Phillipsen, as the General Manager of the project.

57.    There is no separateness between Chevron and the Petropiar joint venture.

58.    In other words, Chevron controls an ostensible joint venture which is severely in debt but which has allowed Chevron to profit through the sale of refined product generated from crude oil extracted through the efforts of services providers like Plaintiff.  For Chevron, it is the bargain of the century: make billions while leaving services providers in Venezuela holding the proverbial bag.

---

[16] One U.S. federal court, as affirmed by a U.S. Court of Appeals, has already determined that PDVSA and Venezuela share a unity of interest.

59.     In response to Plaintiff's repeatedly pressing for payment of the debt owed, Chevron and Petropiar personnel have remained silent.  However, when that same multibillion dollar enterprise created new hurdles for Plaintiff to clear before payment, Plaintiff managed to jump them. Even then, despite promises from Chevron that next steps for payment were forthcoming, Plaintiff remains tens of millions of dollars out of pocket for services rendered. It is hard to overstate the injustice and unfairness to Plaintiff from Chevron's actions and the untenable position in which Chevron has placed Plaintiff.  This lawsuit ensues.

## V.     NOTICE OF APPLICABILITY OF FOREIGN LAW

60.     Pursuant to Federal Rule of Civil Procedure 44.1, Plaintiff gives notice that it intends to raise issues concerning the applicability of the laws of the Republic of Venezuela to Plaintiff's claims in this proceeding.

## VI.     CLAIMS FOR RELIEF

### A.     Unjust Enrichment (Texas Law) (Against Both Defendants)

61.     Plaintiff incorporates paragraphs 1-59 as if stated herein.

62.     Plaintiff asserts the lack of a valid agreement on the subject matter at issue.

63.     Defendants have wrongfully secured a benefit or passively received one, which would be unconscionable to retain.

64.     Defendants have obtained this benefit through duress and the taking of an undue advantage.

65.     Defendants are liable for damages in excess of the jurisdictional limit of this Court.

### B.     Breach of Contract (Texas Law) (Against Chevron Corporation as Alter Ego)

66.     Plaintiff incorporates paragraphs 1-59 as if stated herein.

67.    In the alternative, a valid contract existed between Plaintiff and Petropiar and, thus, Chevron Corporation as the alter ego of Petropiar.

68.    Plaintiff fully performed under the terms of the contract.

69.    Petropiar breached the terms of the contract by failing to pay Plaintiff's invoices.

70.    Plaintiff has sustained damages as a result of Petropiar's breach. Plaintiff pleads damages in excess of the jurisdictional limits of this Court.

71.    Chevron, as the alter ego, of Petropiar, is liable for the damages sustained by Plaintiff as a result of the breach.

**C.    Breach of Contract (Texas Law) (Against Chevron Corporation)**

72.    Plaintiff incorporates paragraphs 1-59 as if stated herein.

73.    In the alternative, a valid novation existed between Plaintiff and Chevron Corporation. Chevron Corporation assumed the joint venture's payment obligations to Plaintiff when a Chevron representative stated that Plaintiff's past due invoices to Petropiar would be paid if Plaintiff agreed to perform additional services for other Chevron Corporation affiliates and operations.

74.    Plaintiff satisfied a reconciliation process and, separately, agreed to perform future drilling and well services for Chevron entities. Accordingly, Plaintiff fully performed under the terms of the novation.

75.    Chevron Corporation breached the terms of the novation.

76.    Plaintiff has sustained damages as a result of Chevron Corporation's breach.

77.    Chevron Corporation is liable for the damages sustained by Plaintiff as a result of the breach.

78.    Plaintiff pleads damages in excess of the jurisdictional limits of this Court.

**D.      Suit on Sworn Account (Texas Law) (Against Chevron Corporation)**

79.      Plaintiff incorporates paragraphs 1-59 as if stated herein.

80.      There was a sale and delivery of merchandise or performance of services by Plaintiff.

81.      The amount of the outstanding account owed by Chevron Corporation to Plaintiff is just, meaning that the prices were charged in accordance with an agreement and the prices charged are usual, customary, and reasonable prices for that merchandise and services.  Indeed, after a lengthy reconciliation process, Chevron Corporation conceded that the amount of the account as reflected in Plaintiff's invoices was owed.

82.      The amount of at least $24,096,811.97 remains unpaid.

83.      Plaintiff pleads damages in excess of the jurisdictional limits of this Court.

**E.      Suit on Sworn Account (Texas Law) (Against Chevron Corporation as Alter Ego)**

84.      Plaintiff incorporates paragraphs 1-59 as if stated herein.

85.      There was a sale and delivery of merchandise or performance of services by Plaintiff to the Chevron Petropiar JV.

86.      The amount of the outstanding account owed by Chevron Corporation as the alter ego of the Petropiar JV is just, meaning that the prices were charged in accordance with an agreement and the prices charged are usual, customary, and reasonable prices for that merchandise and services.  Indeed, after a lengthy reconciliation process, Chevron Corporation as the alter ego of the Petropiar JV conceded that the amount of the account as reflected in Plaintiff's invoices was owed.

87.      The amount remains unpaid.

88.      Plaintiff pleads damages in excess of the jurisdictional limits of this Court.

**F.     Quantum Meruit (Texas Law) (Against Both Defendants)**

89.     Plaintiff incorporates paragraphs 1-59 as if stated herein.

90.     In the alternative, Plaintiff rendered valuable services and furnished valuable materials to Defendants worth at least $24,096,811.97.

91.     Defendants sought to be charged for the services and materials provided by Plaintiff.  Defendants used and enjoyed Plaintiff's services and materials.

92.     Plaintiff reasonably notified Defendants that Plaintiff was expecting to be paid by Defendants.

93.     Defendants are liable for damages in excess of the jurisdictional limit of this Court.

**G.     Unjust Enrichment (*Enriquecimiento Sin Causa,* Venezuelan Law) (Against Both Defendants)**

94.     Plaintiff incorporates paragraphs 1-60  as if stated herein.

95.     Under Article 1,184 of the Venezuelan Civil Code, "he who, without cause, enriches himself at the expense of another, is obligated to indemnify the latter to the extent he has been impoverished."

96.     Defendants received the benefit of the value of Plaintiff's drilling services and equipment, which resulted in the production of crude oil, which Defendants exported to the United States for processing and refining at their refinery in Pascagoula, Mississippi.  Defendants may have also sold that crude oil to other third parties directly.  Defendants converted that crude oil into refined products which they sold, resulting in earnings for Defendants' business.

97.     Plaintiff has incurred tens of millions of dollars in providing services to Defendants, plus value added and income taxes paid.  Defendants have refused to pay Plaintiff for the services it provided.

98.     There is no legal basis that justifies Defendants' retention of benefit without payment.

99.     The Defendants' enrichment directly results from Plaintiff's provision of drilling and well services.

100.    Plaintiff acted in good faith, reasonably expecting compensation. Indeed, Chevron Corporation admitted that Plaintiff was entitled to be paid on the debt it has incurred.

101.    Due to Venezuela's economic conditions, Plaintiff is entitled to restitution adjusted for inflation or in foreign currency, plus legal interest from the date of enrichment per Article 1,277, Civil Code.  Plaintiff is also entitled to all court costs, attorney's fees, and other expenses incurred in prosecuting this claim, under Article 274 of the Code of Civil Procedure.

102.    Plaintiff pleads damages in excess of the jurisdictional limits of this Court.

**H.    Breach of Contract (Venezuelan Law) (Against Chevron Corporation as Alter Ego)**

103.    Plaintiff incorporates paragraphs 1-60  as if stated herein.

104.    In the alternative, Plaintiff refers to Articles 1,159, 1,167, 1,185, 1,186, and 1,264 of the Venezuelan Civil Code.

105.    Contracts have the force of law between the parties, and both are obligated to fulfill their terms in good faith.

106.    A party who fails to perform a contractual obligation without legal excuse is liable for the damages caused to the other party.  Plaintiff fully performed under the terms of the contract.

107.    Petropiar breached the terms of the contract without legal excuse.

108.    Plaintiff, as the non-breaching party, is entitled to compensation for losses directly resulting from the breach, including lost profits and incidental costs, plus interest.

109.    Chevron Corporation has abused the corporate form of Petropiar.  It has used Petropiar as a façade to avoid contractual duties owed to Plaintiff.  As a consequence, Chevron Corporation is liable for the damages sustained by Plaintiff as a result of the breach.

110.    Plaintiff pleads damages in excess of the jurisdictional limits of this Court.

**I.    Breach of Contract (Venezuelan Law) (Against Chevron Corporation)**

111.    Plaintiff incorporates paragraphs 1-60  as if stated herein.

112.    In the alternative, Plaintiff refers to Articles 1,159, 1,167, 1,185, 1,186, and 1,264 of the Venezuelan Civil Code.

113.    Contracts have the force of law between the parties, and both are obligated to fulfill their terms in good faith.

114.    A party who fails to perform a contractual obligation without legal excuse is liable for the damages caused to the other party.  Plaintiff fully performed under the terms of the contract.

115.    Chevron Corporation breached the terms of the novation it formed with Plaintiff without legal excuse.

116.    Plaintiff, as the non-breaching party, is entitled to compensation for losses directly resulting from the breach, including lost profits and incidental costs, plus interest.

117.    Chevron Corporation is liable for the damages sustained by Plaintiff as a result of the breach.

118.    Plaintiff pleads damages in excess of the jurisdictional limits of this Court.

## VII.    CONDITIONS PRECEDENT

119.    All conditions precedent have been performed.

## VIII. ATTORNEY'S FEE DEMAND

120.    Pursuant to Section 38.001 of the Texas Civil Practice & Remedies Code, Plaintiff is entitled to recover its reasonable and necessary attorney's fees for prosecuting its breach of contract claim. Plaintiff has satisfied all conditions precedent, including presenting the claim to Defendant, who failed to pay or perform within 30 days, as required under Section 38.002.

121.    Plaintiff also requests its attorney's fees to the maximum extent permitted under Venezuelan law.

## IX. JURY TRIAL DEMAND

122.    Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury.

## X. PRAYER FOR RELIEF

Plaintiff Servicios Ojeda, C.A. respectfully prays that this Court award all relief to which it is entitled under law and equity, including actual and exemplary damages, attorney's fees, pre- and post-judgment interest, and the imposition of constructive trusts.

Dated: April 16, 2025                        Respectfully submitted,

*s/ Christina Ponig*
Christina Ponig
Attorney-in-Charge
Federal Bar No. 600217
Texas Bar No. 24041706
Derek León
Federal Bar No. 21875
Texas Bar No. 24002463
Heaven Chee
Federal Bar No. 2383177
Texas Bar No. 24087290
**LEÓN COSGROVE JIMÉNEZ, LLP**
700 Louisiana Street, Suite 5300
Houston, Texas 77002

Telephone: 346.250.5660
Facsimile: 305.351.4059

cmaccio@leoncosgrove.com
dleon@leoncosgrove.com
hchee@leoncosgrove.com


*Application for Pro Hac Vice Admission Pending:*

Diego Perez
**LEÓN COSGROVE JIMÉNEZ, LLP**
255 Alhambra Circle, 8th Floor
Coral Gables, Florida 33134
Telephone:
Facsimile: 305.351.4059